

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. AP-75,479

DEMETRIUS DEWAYNE SMITH, Appellant

v.

THE STATE OF TEXAS

ON DIRECT APPEAL
FROM CAUSE NO. 1021168 IN THE 183RD DISTRICT COURT
HARRIS COUNTY

**MEYERS, J., delivered the opinion of the Court in which KELLER, P.J., and HERVEY, HOLCOMB, and COCHRAN, JJ., joined. KEASLER, J., filed a concurring opinion. PRICE, WOMACK, and JOHNSON, JJ., concurred.**

## O P I N I O N

Appellant was convicted in June 2006 of capital murder. TEX. PENAL CODE §19.03(a). Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071 §§2(b) and 2(e), the trial judge sentenced appellant to

death.  Art. 37.071 §2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071 §2(h).

Appellant raises twenty-six points of error, but he does not challenge the sufficiency of

the evidence.  After reviewing appellant's points of error, we find them to be without

merit.  Consequently, we affirm the trial court's judgment and sentence of death.

Appellant was convicted of murdering more than one person during the same

criminal transaction.  TEX. PENAL CODE  §19.03(a)(7)(A).  A brief summary of the

evidence reveals that appellant had been dating Tammie White, a mother of three who

was separated from her husband.  Appellant and White broke up in late January or early

February of 2005.  On the afternoon of March 24, 2005, at approximately 3:15 p.m.,

appellant called White on her cell phone as she, her mother, and her sister were going to

the hospital to visit a relative.  Appellant told White, "You think I'm playing with you,

bitch?  You're going to die today."  White held the phone so her mother and sister could

hear the threats.  White hung up and appellant immediately called back, but White would

not speak to him.  White was not concerned about the calls.

A neighbor reported that earlier on the same day, she witnessed appellant climbing

over White's patio fence.  White was not home, and appellant appeared to be locked out.

Then around 3:00 p.m., she saw appellant again, sitting on White's porch, but White's car

was gone at the time.

Later that same day, White was home with her eleven-year-old daughter, Kristina.

---

[1] Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

Kristina was playing with some neighborhood friends on the front porch, while White was in the back bedroom talking on the phone with her sister, Katherine. At approximately 6:00 p.m., appellant came up to the door. Kristina tried to stop him from entering her home, but appellant pushed her out of the way and went inside. Appellant went to the back bedroom. Over the phone, Katherine twice heard White say, "[Appellant], don't play with me." Katherine then heard gunshots and the phone went dead. Appellant shot White in the chest, neck, and head at close range.

Meanwhile, Kristina had followed appellant inside and got a knife from the kitchen. Immediately following the gunshots, Kristina came back out and told the other children that appellant had shot her mom and to run. Kristina ran around a car, dropped the knife, and got down in a ball, covering her head with her hands to protect herself. Within a minute, appellant came out of the house and approached Kristina. He then shot her twice, once through the top of the head, before running off. As he was leaving, witnesses heard appellant say that now he was going to get Tamara, referring to Kristina's fourteen-year-old sister who was not home at the time. Appellant was apprehended shortly thereafter. Tamara, who had been taken into protective custody following the threat to her life, remained unharmed.[2]

In points of error one through three, appellant argues that the trial court erred by denying his motion to quash and amending the indictment to insert the language, "during

---

[2] Appellant did not threaten to harm Danyale, Kristina's three-year-old sister, who was playing outside at the time as well.

the same criminal transaction." He claims this violated Article 28.10, due process, and his right to a grand-jury indictment under both the federal and state constitutions. Specifically, appellant complains that the amendment, which was made before jury selection began, transformed the charged offense from two separate counts of murder to one count of capital murder. Therefore, he alleges that this altered the charge against him without proper notice.

In analyzing these issues, some background information is helpful. On March 25, 2005, appellant was charged by complaint with capital murder as follows:

> [Appellant], hereafter styled the Defendant, heretofore on or about March 24, 2005, did then and there unlawfully, during the same criminal transaction, intentionally and knowingly cause the death of [K]RISTINA HARRIS by SHOOTING [HER] WITH A DEADLY WEAPON TO WIT, NAMELY A FIREARM, and intentionally and knowingly cause the death of TAMMIE HARRIS by SHOOTING [HER] WITH A DEADLY WEAPON TO WIT, NAMELY A FIREARM.

On May 23, 2005, appellant was indicted by the grand jury. In the title area of the indictment, the felony charge is listed as "CAPITAL MURDER." The body of the indictment in one paragraph states:

> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, [appellant], hereafter styled the Defendant, heretofore on or about March 24, 2005, did then and there unlawfully, intentionally and knowingly cause the death of KRISTINA HARRIS by SHOOTING KRISTINA HARRIS WITH A DEADLY WEAPON, NAMELY A FIREARM, and intentionally and knowingly cause the death of TAMMIE HARRIS by SHOOTING TAMMIE HARRIS WITH A DEADLY WEAPON, NAMELY A FIREARM.

On August 16, 2005, the State served its "Notice of Intent to Seek the Death Penalty."

On May 4, 2006, appellant filed a Motion to Set Aside the Indictment because the Texas

death penalty scheme is unconstitutional. He also filed a motion to declare the Texas

death penalty scheme unconstitutional and to preclude imposition of the death penalty.

These motions were denied during the initial pre-trial hearing on May 4, 2006. At this

same hearing, defense counsel noted that they had been working on the mitigation issues

in the case for several months. Appellant was also arraigned by the trial court. After

reading the indictment, the trial court asked, "All right. [Appellant], to the offense of

capital murder, how do you plead, guilty or not guilty?" Appellant pleaded "not guilty."

On May 5, 2006, the trial court heard the State's request to amend the indictment

to insert the phrase, "during the same criminal transaction." Appellant objected that the

indictment could not be amended under Article 28.10 because the amended indictment

would charge an offense not charged in the original indictment. He argued that the

original indictment charged two murders in one paragraph and that, as such, the offenses

were improperly joined. He claimed that the State needed to seek re-indictment and that

an amendment would also violate the due-process clause of the United States

Constitution. The trial court overruled appellant's objection but allowed appellant leave

to file a motion to quash the indictment. The amended indictment read:

> The duly organized Grand Jury of Harris County, Texas, presents in the
> District Court of Harris County, Texas, that in Harris County, Texas,
> [Appellant], hereafter styled the Defendant, heretofore on or about March
> 24, 2005, did then and there unlawfully, *during the same criminal*

> *transaction*, intentionally and knowingly cause the death of KRISTINA HARRIS by SHOOTING KRISTINA HARRIS WITH A DEADLY WEAPON, NAMELY A FIREARM, and intentionally and knowingly cause the death of TAMMIE HARRIS by SHOOTING TAMMIE HARRIS WITH A DEADLY WEAPON, NAMELY A FIREARM.

(Emphasis added to amendment handwritten on face of indictment).

Appellant's written motion argued, in pertinent part, that the indictment alleged two separate murders which statutorily would not support a death sentence; and, although the offenses were improperly joined, it was a valid indictment presenting two non-capital offenses. Therefore, under Article 28.10, the indictment could not be amended because to do so would charge appellant with a different offense. He also argued that indicting him for capital murder would violate his substantial rights to a grand jury and due process. The trial court denied appellant's motion.

The sufficiency of an indictment is a question of law and is reviewed *de novo*. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). The right to notice is set forth in both the United States and Texas Constitutions. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. In addition, the Texas Code of Criminal Procedure provides guidelines relating to the sufficiency of an indictment. *See, e.g.*, Articles 21.03, 21.04, and 21.11. Thus, the indictment must be specific enough to inform the defendant of the nature of the accusations against him so that he may prepare a defense. *Moff*, 154 S.W.3d at 601. However, the due-process requirement may be satisfied by means other than the language

in the charging instrument. *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003).

When a motion to quash is overruled, a defendant suffers no harm unless he did not, in

fact, receive notice of the State's theory against which he would have to defend. *Id.; see

also* Art. 21.19 ("An indictment shall not be held insufficient, nor shall the trial, judgment

or other proceedings thereon be affected, by reason of any defect of form which does not

prejudice the substantial rights of the defendant").

Texas Penal Code § 19.03(a)(7) defines capital murder as murdering more than

one person: (A) during the same criminal transaction; or (B) during different criminal

transactions but pursuant to the same scheme or course of conduct. Murder is defined as

the death of "an individual." TEX. PENAL CODE §19.02. The original indictment on its

face lists the charge as "CAPITAL MURDER," and, in a single paragraph, alleges that

appellant knowingly caused the death of more than one person. The indictment notified

appellant of the nature of the charge against him although it was defective for failing to

state whether the deaths were during the same criminal transaction, or same scheme or

course of conduct. Appellant, in fact, worked for months preparing his defense to a

capital-murder charge. Therefore, the amendment was not barred by Article 28.10(c),

which prohibits amendments if the new indictment charges the defendant with an

additional or different offense.

Further, appellant's substantial rights were not harmed. *See* Arts. 21.19 & 28.10;

*Kellar*, 108 S.W.3d at 313. The record in this case clearly shows that appellant had actual

notice of the capital charge upon which the State was basing its allegations. We reject appellant's argument that this Court should presume the indictment was defective due to misjoinder and in contradiction of the listed felony charge title in the indictment that was signed by the grand jury. Points of error one, two, and three are overruled.

In points of error four through thirteen, appellant claims that the trial court erroneously granted the prosecution's challenges for cause to ten veniremembers based on their personal beliefs against capital punishment in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Adams v. Texas*, 448 U.S. 38 (1980). A veniremember who can set aside his beliefs against capital punishment and honestly answer the special issues is not challengeable for cause. *See Witherspoon*, 391 U.S. at 522-23; *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). A veniremember is challengeable for cause if his beliefs against capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and the juror's oath. *See Colburn*, 966 S.W.2d at 517.

We review a trial court's ruling on a challenge for cause with "considerable deference" because the trial court is in the best position to evaluate the veniremember's demeanor and responses. *See Wainwright v. Witt*, 469 U.S. 412, 429 (1985); *Guzman*, 955 S.W.2d at 89 (appellate courts afford "almost total deference" to the trial court's resolution of issues that turn on an evaluation of credibility and demeanor). When the potential juror's answers are vacillating, unclear, or contradictory, particular deference is

accorded to the trial court's decision. *Colburn*, 966 S.W.2d at 517. We will reverse a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *See id.*

Appellant first complains that the trial court erroneously granted the State's challenge to venire member Juan Corral. Corral stated on his written juror questionnaire that he had "mixed feelings" about the death penalty and his answers to several of the questions regarding the death penalty were conflicting. During voir dire, the trial court first questioned Corral before turning him over to counsel:

> [COURT]: Bottom line is this: Anything religiously or morally that would prevent you from answering these questions in such a way that you would know that I would impose the death penalty as punishment in a capital murder case?
>
> [Juror]: Religiously, I guess, I am against it.
>
> * * *
>
> [COURT]: Is there something about your religious belief that you could not participate as a juror in a case like this knowing the way you answered those questions could require me to impose death upon [appellant]?
>
> [Juror]: Yeah, I guess, yes.

The State then moved to challenge, and defense counsel objected. The trial court denied the challenge. The State then began its voir dire:

> [State]: I guess the Judge kind of gave me my lead-off question, are you opposed to the death penalty? What are your thoughts? What do you think about it?

[Juror]:      I'm for it and against it.

[State]:      When you say you're for it, there are certain fact patterns in your mind that you could think of that make you say, o.k., yes, that person should receive the death penalty?

[Juror]:      Yes.

* * *

[State]:      Here's kind of an interesting twist, you're a potential juror. You have to listen to all the evidence and find the person guilty or you can find him not guilty. If you find them not guilty, they walk out the door. You find them guilty, we go into the punishment phase of trial.

In the punishment phase, you are going to hear more evidence, possibly from the State, possibly from the Defense; and then at the conclusion of that evidence, you get to consider everything you heard in the guilt/innocence phase including any additional evidence that may be brought to you in the punishment phase, and then you have to answer Issue No. 1. If you answer Issue No. 1, yes, you go on to Issue No. 2. And if you answer Issue No. 2 no, by law the Judge is required to impose a death sentence. It's not that the judge can say, well, I've changed my mind; I think I'm going to give him life. She's required in the way you answer those questions to sentence that man sitting right there in the orange shirt to death by lethal injection. It's a pretty big responsibility. Can you do that? Can you participate in this trial?

[Juror]:      I don't think so. That's pretty strong.

[State]:      Oh, it is strong and that's why we wanted to chat with you a little bit and because this is so serious, we need definite answers. I'm not trying to be ugly to you, but it's yes I can or no I can't, not maybe or possibly. Can you participate in this?

[Juror]:      No.

[State]:      You would have – you mentioned a religious objection or a moral objection, to participating in the capital murder trial where a person could be sentenced to death; is that correct?

[Juror]:     Uh-huh, yes.

[State]:     So, what I am understanding you to say is that you have a conscientious scruples [sic] in regards to the infliction of punishment of death for a crime in a capital case where the State is seeking the death penalty; is that correct?

[Juror]:     Yes.

The trial court then granted the State's challenge for cause. Defense counsel objected to the trial court's ruling; however, defense counsel did not attempt to rehabilitate the juror.

Here, the voir dire record supports the trial court's ruling. Although Corral appeared to vacillate regarding the death penalty on his questionnaire, he clearly stated that he could not participate in answering the special issues in such a manner that a death sentence would be imposed. According appropriate deference to the trial court's decision, we hold that the court did not abuse its discretion in sustaining the State's challenge for cause. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant complains about the challenge of venire member James Pettitt, Jr., for cause. Pettitt was a 65-year-old retiree and veteran of the Vietnam War. In his written questionnaire and during questioning by the State, Pettitt stated that he believed in the death penalty as a valid punishment for capital murder. However, as questioning continued, Pettitt began to equivocate in his answers:

[State]:     And I want to ask you whether you personally can sit on this jury knowing that if you find him guilty and I prove to you beyond a reasonable doubt he committed the crime, and if you have evidence such that convinces you beyond a reasonable doubt that the answer to Issue No. 1 is yes, and you believe that the answer to Issue No. 2 should

be no, then he's sentenced to die by lethal injection. Can you participate in this process?

[Juror]: It's very difficult.

* * *

[State]: I got to know now because I've got to decide whether to put you on this jury. [Defense counsel] has to decide whether or not to put you on this jury. And I've got to know, if I prove my case beyond a reasonable doubt to you and I prove Issue No. 1 to you, and you believe that the answer to Issue No. 2 is no, the law says I'm entitled for you to answer the questions that way if the evidence is there. I want to make sure that you're going to answer it that way or if you're going to say, you know what, I can't do it. This is why we're here now to find out about you.

[Juror]: I understand that. It's very difficult for me to come out and say this, I mean, you know.

[State]: I'm giving you the out to say whatever you want to say, whichever way it is.

[Juror]: Like I said before, it's really a tough decision for me at this point.

[State]: And I got to ask you now, can you be on the jury or not?

[Juror]: I don't think so.

[State]: And is that because something about you, whether you have scruples or whatever about you personally being on a jury where the imposition of death is a possibility?

* * *

[Juror]: Yes.

[State]: Is that your answer? Do you have scruples about being on this jury or something about you being on this jury or against the death penalty for you personally as a juror, if I asked that right?

[Juror]:  Well, I don't have anything, I guess I don't have – I say "guess," I don't have a problem, I guess, with the death penalty, but my personal feelings right now, I'm just – it's kind of questionable.  I'm sorry.

[State]:  Does that mean that you can't guarantee me that your verdict will be based solely on the evidence that you hear in the courtroom, that there is a possibility that your personal feelings or morals or whatever it is, may cause you to answer the questions differently than the evidence, knowing that the death penalty could be assessed? I'm reading your answer as yes.

[Juror]:  Yes.

[State]:  Judge, we have a challenge.

[COURT]:  I need to hear it out of your mouth.  I think what he's getting at, and I know he's trying to ask it in different ways, but the bottom line is this: Would you violate your own conscience, I mean your own moral conscience if you sat on this case knowing that ultimately your decision on how you answer these questions would result in me sentencing this man to death?

[Juror]:  I think it would bother me, yes.

[COURT]:  Okay.  You said "I think," would it?

[Juror]:  Yes.

\* \* \*

I guess it's because I've been through this Vietnam thing and whatever else.

Defense counsel then began his voir dire of Pettitt, explaining that the defense was looking for a cross-section of the community with differing views.  Counsel also explained that Pettitt would be hearing evidence from both sides.  Counsel then inquired:

[Defense]:  But all you are called upon to do is to answer those issues based

upon the evidence. Are you telling the Judge and all of us that you can't answer those issues honestly based on the evidence?

[Juror]: I can answer those questions honestly, but in my own mind, I don't want to take somebody's life. Okay. You understand what I'm saying? Yes, I understand what they're saying, can I go along with that to the point, you know, everything, what he has talked to me about. I just in my own personal feelings, I just don't think I need to be here.

[Defense]: You just don't want to is that what you're saying?

[Juror]: I just don't want to be involved in this or morally –

[Defense]: But you could answer those issues?

[Juror]: Sir?

[Defense]: You could honestly answer those issues based upon the evidence?

[Juror]: I'm sure I could, yes.

[Defense]: Participate in a verdict, you just don't want to do it; is that correct?

[Juror]: I just don't want to be –

[Defense]: Part of the process?

[Juror]: No, I don't want to be part of this type of trial. Sorry.

As can be seen from the record, Pettitt continuously qualified his answers even when he was asked to give a firm response. He stated that he believed in the death penalty and could follow the law, but repeatedly stated that he did not want to participate in the punishment phase of the trial. He went so far at one point as to say that he would not follow the evidence if that meant he could ensure a life sentence. In sum, he was an

"equivocating" juror and, therefore, we defer to the trial judge who was able to observe Pettitt's demeanor and assess his capacity to serve. The trial judge who hears the answers of an equivocating venire person has the opportunity to observe the tone and demeanor of the prospective juror in determining the precise meaning intended, while we have only the cold record. *See Briddle v. State*, 742 S.W.2d 379, 384 n. 4 (Tex. Crim. App. 1987). Therefore, as the trial court's decision falls within the zone of reasonable disagreement, we shall defer to its ruling. Appellant's fifth point of error is overruled.

Appellant next complains about the State's challenge to prospective juror Beverly Calhoun. Prior to allowing the State or defense to question her, the trial court asked Calhoun if she had any moral, religious, or conscientious objections to the death penalty. Calhoun said that her religious beliefs would prevent her from sentencing someone to death. She further stated that she could not participate as a juror and "would not be able to give a death sentence to anybody or, say, go that route." Calhoun never stated that she could follow the law and answer the special issues according to the evidence. Defense counsel objected to the challenge, but declined to question the juror. It is clear from the record that Calhoun's beliefs against capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the court's instructions and the juror's oath. *See Colburn*, 966 S.W.2d at 517. The trial court did not abuse its discretion in granting the State's challenge for cause. Point of error six is overruled.

In point of error seven, appellant argues that venire person Juanita Prieto was

improperly excused for cause. In her written juror questionnaire, Prieto stated that she did not feel that she could judge a death-penalty case and that she should not have the death penalty "on her hands." Following general voir dire by the trial court, Prieto requested to speak with the judge. Prieto told the trial court: "I don't think I'm comfortable making the decision or answering [in a way] that will basically have you sentence him to death." She further stated that she could not sleep at night knowing her answers to the issues caused a death sentence to be imposed; this violated her conscience. The State challenged her at that time, but because defense counsel objected, the trial court had her brought back for individual voir dire.

At individual voir dire, the trial court inquired further into Prieto's feelings regarding the death penalty. The court explained to her that it did not matter whether the process made her feel uncomfortable; what the court needed to know was whether she had any moral, religious, or conscientious objections to the imposition of the death penalty in an appropriate capital-murder case. Prieto answered, "Yes." The trial court granted the State's challenge for cause over appellant's objection. Defense counsel did not attempt to elicit any further responses from Prieto.

It is clear from the record that Prieto's beliefs against capital punishment would prevent or substantially impair the performance of her duties as a juror. *See Colburn*, 966 S.W.2d at 517. The trial court did not abuse its discretion in granting the State's challenge for cause. Point of error seven is overruled.

In his eighth point of error, appellant contends that the trial court abused its discretion in granting the State's challenge for cause to venire member Craig Fronckiewicz. The record shows that Fronckiewicz consistently stated that he would seek any and every mitigating factor that he could potentially find in order to ensure a life sentence. He stated that he would hold the State to a burden higher than the law required, and that he had essentially pre-judged the instant case because he would always find appellant's young age to be a sufficient mitigating circumstance under the second special issue. Following numerous questions by the State, the trial court stepped in to confirm his answer:

> [COURT]: That's why the question is being asked. We want to make sure that you can take an oath to follow the law, apply the facts to the evidence wherever it leads you. Because for you to sit on the jury, to potentially have an agenda such that you would answer these questions in such a way as to make sure the Defendant only gets life, it wouldn't be right. You would be lying to the Court, et cetera. You see what I'm saying? All we're trying to do is just establish, if you're selected to sit as a juror, you could follow the questions wherever they lead you.
>
> When you get to Special Issue No. 2, I don't know what you're going to hear. You may hear something mitigating. You may not hear something mitigating. It's up to each individual juror, and we gave examples of what might be mitigating, what might not be mitigating to another juror. The bottom line is, have you heard anything; and if you have, is it sufficient for you to give life instead of death. But to automatically give it just because you heard something mitigating wouldn't be right. Do you see what I'm saying? It all has to be weighed out and, I guess, that's where you always or would you – are you telling us that if you heard something mitigating, period, you would always say that was sufficient such that you would answer that question, yes.

[Juror]: I would say that's a fair way of saying it. I think to be – almost anything that would allow me to say yes to the second question.

The trial court did not abuse its discretion in granting the State's challenge for cause. This Court has upheld challenges for cause in similar situations. *See Colburn*, 966 S.W.2d at 518 (juror could honestly answer question but in his mind there would always be sufficient mitigating circumstances for a life sentence); *Smith v. State*, 907 S.W.2d 522, 529 (Tex. Crim. App. 1995)(juror believed that "there are always mitigating circumstances in the nature of life" and so would always find sufficient mitigating circumstances). Point of error eight is overruled.

In point of error nine, appellant complains regarding the State's challenge for cause to prospective juror Hubertus Thomeer. During initial voir dire by the trial court, Thomeer made it plain that, due to his religion, he would be unable to answer the special issues in such a way that the death penalty would be imposed. In order to obtain a final clarification of his response, the trial court asked the following:

[COURT]: Because of your religious and moral beliefs, would you answer these questions in such a way that [appellant] got life instead of death?

[Juror]: Yes.

The trial court did not abuse its discretion in granting the State's challenge for cause. *See Colburn*, 966 S.W.2d at 518; *Smith*, 907 S.W.2d at 529. Point of error nine is overruled.

In his tenth point of error, appellant complains regarding venire member Donna

Frac. In her juror questionnaire, Frac stated, "I don't feel that I can be truly honest with my feeling regarding capital murder." During individual voir dire by the State, she clarified her statement by agreeing that it would violate her conscience, morals, or religion to participate in the death-penalty process. The trial court continued to question Frac. Frac stated that the death penalty violated her conscience in that she did not "feel comfortable in making the decision in a death decision of someone," and that she did not think that she could "ultimately make that decision." The trial court sought further clarification and finally asked:

> [COURT]: Hypothetically, if you were to sit on this jury, do you think that you would be inclined to answer these questions in such a way that the Defendant got life instead of death?
>
> [Juror]: Yes, yes.

The trial court did not abuse its discretion in granting the State's challenge for cause. *See Clark v. State*, 929 S.W.2d 5, 8-9 (Tex. Crim. App. 1996) (a prospective juror who maintains she will consciously distort her answers must be excused on challenge for cause); *see also Colburn*, 966 S.W.2d at 518; *Smith*, 907 S.W.2d at 529. Point of error ten is overruled.

In point of error eleven, appellant complains regarding the trial court's granting of the State's challenge to Timothy Towsen. During voir dire, Towsen stated that it would violate his conscience to sit on the jury in a death-penalty case and that he could not do it. Towsen repeatedly told the trial court that he "wouldn't feel comfortable" sitting on a

capital jury. The trial court explained that his comfort was irrelevant, but what was relevant was whether it would violate his conscience in such a way that he could not honestly answer the special issues knowing appellant could receive the death penalty. Towsen responded, "I can't." The State challenged Towsen for cause. Defense counsel did not conduct any voir dire, but objected to the challenge.

The trial court did not abuse its discretion in granting the State's challenge. The State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths. *Adams*, 448 U.S. at 50; *see also Lockett v. Ohio*, 438 U.S. 586, 595-96 (1978) (no *Witherspoon* violation if prospective juror's conviction so strong he could not take oath, knowing death penalty possible). Point of error eleven is overruled.

In point of error twelve, appellant avers the trial court erred in granting the State's challenge to prospective juror Matthew Stringer. Stringer stated in his written juror questionnaire that, "If this is a murder trial, I couldn't [be a juror] [be]cause the talk of death in any way make[s] me uncomfortable." During individual voir dire, the trial court attempted to get some clarification of this statement, and Stringer answered that "anything about [death]" bothered him. Again the trial court attempted to elicit a definitive answer from Stringer, and Stringer finally stated that he was morally and conscientiously opposed to the death penalty even in an appropriate capital-murder case. Defense counsel declined to question Stringer, but objected to the State's challenge for cause. As it is clear

Stringer's personal feelings against capital punishment would prevent or substantially impair the performance of his duties as a juror, the trial court did not abuse its discretion in granting the State's challenge for cause. *See Colburn*, 966 S.W.2d at 517. Point of error twelve is overruled.

In point of error thirteen, appellant argues that the trial court abused its discretion in granting the State's challenge to venire member Patricia Cruz. In her written juror questionnaire, Cruz stated, "We do not have the right to terminate God's life expectancy of that person," and that she was opposed to capital punishment under any circumstances. Upon entering the courtroom for individual voir dire, she immediately stated, "I plead the Fifth Amendment." In response to questioning by the trial court, Cruz indicated that she was against the death penalty for both religious and conscientious reasons, and that she had objections to the imposition of the death penalty in an appropriate capital-murder case. Neither the State nor the defense questioned her.

The trial court did not abuse its discretion in granting the State's challenge for cause over appellant's objection. *See King v. State*, 29 S.W.3d 556, 567-68 (Tex. Crim. App. 2000) (no error in sustaining challenge to prospective juror who could not impose the death penalty). Point of error thirteen is overruled.

In points of error fourteen and fifteen, appellant complains that the trial court erred when it denied his request for a jury charge on the lesser-included offense of murder. Specifically, he argues that the evidence could have allowed the jury to conclude that the

two deaths did not occur in the "same transaction." He posits that the evidence shows that White's murder was his objective and that the death of the child was a completely separate transaction. Appellant contends that the jury could have believed that he killed Kristina only because she threatened him with a knife; thus the two murders were not the product of the same transaction.

In determining whether appellant is entitled to a charge on a lesser-included offense, we must consider all of the evidence introduced at trial, whether produced by the State or the defendant. *Goodwin v. State*, 799 S.W.2d 719, 740 (Tex. Crim. App. 1990). This Court uses a two-pronged test in its review. *Rousseau v. State*, 855 S.W.2d 666, 672-75 (Tex. Crim. App. 1993); *Goodwin*, 799 S.W.2d at 740-41. First, the lesser-included offense must be included within the proof necessary to establish the offense charged. *Id.* Second, there must be some evidence in the record that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given. *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).

This Court has long held that murder is a lesser-included offense of capital murder. *See Feldman v. State*, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002); *Thomas v. State*, 701 S.W.2d 653, 656 (Tex. Crim. App. 1985). Therefore, appellant has met the first prong of

the test.  However, appellant fails to meet the second prong.  The evidence shows that almost immediately after shooting her mother, appellant exited the apartment and deliberately sought out Kristina, who was balled up in a defensive position behind a car with no weapon in her hand.  With the same gun, he shot Kristina twice at point blank range and then stated he was going after Kristina's older sister.  There is no evidence that Kristina ever threatened appellant with the knife or that he was ever aware that she had the knife in her possession.  Furthermore, it is irrelevant whether Kristina threatened appellant with the knife.  Even if appellant had originally intended only to kill White, there is no evidence that he did not kill Kristina during "a continuous and uninterrupted chain of conduct occurring over a very short period of time . . . in a rapid sequence of unbroken events."  *See Feldman*, 71 S.W.3d at 752; *see also Massey v. State*, 933 S.W.2d 141, 155-56 (Tex. Crim. App. 1996).

Given these facts, we conclude that there is no evidence in the record from which a rational trier of fact could determine that appellant was guilty only of murder.  The trial judge did not err in refusing the instruction.  Points of error fourteen and fifteen are overruled.

In points of error sixteen and seventeen, appellant argues that the trial court erred in failing to define the term "same criminal transaction" in the jury charge.  He contends that the term is vague and may be inconsistently applied.  Appellant further argues that he specifically was harmed because whether the deaths were caused "during the same

criminal transaction" was at issue in his case.

The Texas Legislature did not define the term "same criminal transaction." *See Feldman*, 71 S.W.3d at 752. Words which are not statutorily defined are to be given their usual meanings, and no specific instructions are required. *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994). Because jurors are presumed to attach a common understanding to the meaning of this term, there was no error in rejecting appellant's request for a definition. Further, as there was no evidence in the record from which a rational jury could find appellant was guilty only of murder (*see* points of error fourteen and fifteen, *supra*), any error resulting from the failure to define "same criminal transaction" would not have contributed beyond a reasonable doubt to appellant's conviction or punishment. *See* TEX. R. APP. P. 44.2. Points of error sixteen and seventeen are overruled.

In points of error eighteen and nineteen, appellant contends that the trial court erred in admitting State's Exhibits 73 and 74 over his objection that they violated his Sixth Amendment right to confront and cross-examine the witnesses against him. We agree that the admission of certain portions of State's Exhibit 73 violated appellant's Sixth Amendment rights; however, appellant was not harmed by their admission.

State's Exhibits 73 and 74 are penitentiary packets containing "TDCJ-ID disciplinary report and hearing records" regarding appellant's conduct within the prison population during some previous incarcerations. The trial court admitted these reports

under the business records exception to the hearsay rule. *See* TEX. R. EVID. 803(6). The records contained offense descriptions, and most of the documents designated that the evidence came from the "officer's report" although the officers' reports were not included in the admitted documents. The record further reflects that offense descriptions from the disciplinary reports were read aloud to the jury at the punishment phase.

In *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005), we held that jail records containing specific incident reports written by corrections officers graphically documenting their detailed observations of the defendant's numerous disciplinary offenses were testimonial and inadmissible under *Crawford v. Washington*, 541 U.S. 36, 51-55 (2004), when those officers did not testify at trial. We specifically held that "[t]he trial court erred in admitting *those portions* of the reports that contained the testimonial statements." *Russeau*, 171 S.W.3d at 881 (emphasis added). Only those portions of the otherwise admissible jail business records that contained testimonial descriptions of specific facts and observations were inadmissible. We have further held that "boilerplate" language that does not contain any such testimonial statements, narratives of specific events, or written observations is admissible. *See Segundo v. State*, 270 S.W.3d 79, 106-07 (Tex. Crim. App. 2008) (op. on reh'g). Texas courts have recognized this distinction between (1) official records that set out a sterile and routine recitation of an official finding or unambiguous factual matter such as a judgment of conviction or a bare-bones disciplinary finding and (2) a factual description of specific observations or events

that is akin to testimony.[3]

The disciplinary report and hearing records in State's Exhibits 73 and 74 mostly contain bare-bones recitations of infractions committed by appellant or involve trivial non-violent disciplinary violations. The violations include, for example: failure to show up for work assignments, failure to show up for medical appointments, being in a place he was not supposed to be at that time, and unauthorized exchange of commodities such as soup, cookies and candy. Although these are trivial infractions, the reports still contain testimonial statements regarding appellant's conduct.

However, two particular documents go beyond a sterile description and violate appellant's rights as set out in *Russeau*. The reports contain descriptions of the offenses which appear to have been copied from the corrections officers' reports and which purport to document, in detailed terms, appellant's disciplinary offenses. Appellant

---

[3] *See Campos v. State*, 256 S.W.3d 757, 761-62 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd.) (holding that admission of autopsy report did not violate Confrontation Clause and explaining that distinction between a testimonial and non-testimonial report does not "depend solely on the inclusion or omission of detailed and graphic personal observations, but rather on the extent to which the records are either sterile recitations of fact or a subjective narration of events" related to the person's potential guilt); *Azeez v. State,* 203 S.W.3d 456, 466 (Tex. App.—Houston [14th Dist.] 2006) (challenged records contained sterile recitations and were admissible over *Crawford* Confrontation Clause objection*), rev'd on other grounds,* 248 S.W.3d 182 (Tex. Crim. App. 2008); *Grant v. State*, 218 S.W.3d 225, 229-32 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (some entries in high school disciplinary records contained testimonial statements; "Because the State did not show that the various teachers and school administrators who provided these statements were both unavailable to testify and had been cross-examined previously, we hold the trial court erroneously admitted the testimonial portions of these records."); *Ford v. State,* 179 S.W.3d 203, 208-09 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (upholding admission of inmate disciplinary records that contained only a sterile recitation of offenses and the punishments received).

pleaded "not guilty" to the offenses and the hearings took less than six minutes. Appellant's alleged disciplinary offenses included fighting with another inmate in the showers and exposing himself and masturbating in front of a jailer. None of the individuals who supposedly observed appellant's disciplinary offenses testified at the instant trial.

These disciplinary reports contain testimonial statements which were inadmissible under the Confrontation Clause because the State did not show that the declarants were unavailable to testify, and appellant never had an opportunity to cross-examine any of them. *Russeau*, 171 S.W.3d at 880. The trial court erred in admitting those portions of the reports that contain the testimonial statements.

Having found constitutional error, we need not reverse the trial court's judgment if we conclude beyond a reasonable doubt that the error did not contribute to appellant's punishment. *Chapman v. California*, 386 U.S. 18, 24 (1967); *see generally,* W. LaFave, et al., Criminal Procedure §27.6(e) (2d ed.1999). Here, although the inadmissible reports were read aloud to the jury, they were never emphasized again by the State in any way. The State concentrated its punishment arguments on the heinousness of the capital murder itself and appellant's disregard for anyone but himself.[4] Given the record before us, we conclude beyond a reasonable doubt that appellant was not harmed by the introduction of

---

[4] The one jail altercation referred to by the State in closing arguments took place in the county jail shortly after appellant's arrest for the immediate offense. This altercation was documented in an exhibit not objected to by appellant.

this evidence. *Cf. Russeau*, 171 S.W.3d at 881. Points of error eighteen and nineteen are overruled.

In appellant's twentieth point of error, he argues that the Texas lethal-injection protocol violates the Eighth and Fourteenth Amendments to the federal constitution. Because appellant's execution is not imminent, his claim is not ripe for review. *Gallo v. State*, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007). Furthermore, appellant did not litigate this issue in the trial court, and so the record is not sufficiently developed for this Court to resolve his claim. *See Bible v. State*, 162 S.W.3d 234, 250 (Tex. Crim. App. 2005). Appellant's twentieth point of error is overruled.[5]

In points of error twenty-one and twenty-two, appellant argues that the Texas capital sentencing scheme is unconstitutional because it fails to assign a burden of proof on the mitigation special issue, and that the trial court erred in rejecting his request for an instruction assigning the burden to the State. We have previously rejected this argument. *See Blue v. State*, 125 S.W.3d 491, 500-01 (Tex. Crim. App. 2004). Further, this Court has held that the mitigation special issue is a defensive issue in which the State has no burden of proof. *Williams v. State*, 273 S.W.3d 200, 221-22 (Tex. Crim. App. 2008). Points of error twenty-one and twenty-two are overruled.

---

[5] We note that the Supreme Court recently held in *Baze v. Rees*, 128 S.Ct. 20 (2008), that the Kentucky lethal-injection protocol, which is very similar to the Texas protocol, does not violate the Eighth Amendment.

Appellant contends in his twenty-third point of error that Article 37.071 is unconstitutional under the Eighth and Fourteenth Amendments because the mitigation special issue permits the very type of open-ended discretion condemned in *Furman v. Georgia*, 408 U.S. 238 (1972).  We have previously rejected this claim, and appellant raises nothing new to persuade us to reconsider this issue.  *See Raby v. State*, 970 S.W.2d 1, 7 (Tex. Crim. App. 1998); *Pondexter v. State*, 942 S.W.2d 577, 586-87 (Tex. Crim. App. 1996).  Point of error twenty-three is overruled.

In point of error twenty-four, appellant posits that the mitigation issue is unconstitutional because meaningful appellate review of the sufficiency of the evidence is impossible.  We have rejected the claim that the issue deprives a defendant of "meaningful appellate review" under the federal constitution.  *Russeau*, 171 S.W.3d at 886; *Prystash v. State*, 3 S.W.3d 522, 535-36 (Tex. Crim. App. 1999)*; Green v. State*, 934 S.W.2d 92, 106-07 (Tex. Crim. App. 1996); *McFarland v. State*, 928 S.W.2d 482, 498-99 (Tex. Crim. App. 1996).  Point of error twenty-four is overruled.

In point of error twenty-five, appellant contends that Article 37.071 is unconstitutional because the death penalty constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments.  Relying upon Justice Blackmun's dissenting opinion in *Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J., dissenting), appellant claims that the Texas scheme violates the prohibition against cruel and unusual punishment because it is the product of paradoxical constitutional commands.  This Court

has repeatedly rejected this argument. *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *McFarland*, 928 S.W.2d at 520. This point of error is overruled.

Finally, in appellant's twenty-sixth point of error, he contends that Article 37.071 violates the Eighth and Fourteenth Amendments because it fails to require that jurors be informed that a single holdout juror on any special issue would result in an automatic life sentence. Appellant further argues that the "10-12 rule" violates the Eighth Amendment principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and that the trial court violated his constitutional rights by instructing the jury in this manner. We have previously decided these issues adversely to appellant. *Russeau*, 171 S.W.3d at 886 (10-12 Rule); *Shannon v. State*, 942 S.W.2d 591, 600-01 (Tex. Crim. App. 1996) (single hold-out juror); *Lawton v. State*, 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995) (single hold-out juror and 10-12 Rule). Point of error twenty-six is overruled.

We affirm the judgment of the trial court.

Meyers, J.

DELIVERED: May 6, 2009

PUBLISH